## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JUDY GOMILLA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. NO.: |
| vs. | ) | |
| | ) | SECTION: |
| BRACCO DIAGNOSTICS, INC.; | ) | |
| BRACCO RESEARCH USA, INC. | ) | |
| BIPSO GMBH; BRACCO | ) | **COMPLAINT** |
| IMAGING, S.P.A.; BRACCO | ) | **AND JURY DEMAND** |
| GROUP; BRACCO IMAGING | ) | |
| GROUP; TAKEDA GMBH; | ) | |
| ACIST MEDICAL SYSTEMS, INC. | ) | |
| D/B/A ACIST SILICON VALLEY; | ) | |
| MCKESSON MEDICAL- | ) | |
| SURGICAL, INC.; MCKESSON | ) | |
| CORPORATION; MERRY X-RAY | ) | |
| CHEMICAL CORPORATION; | ) | |
| GE HEALTHCARE, INC.; | ) BIPSO GMBH | |
| GENERAL ELECTRIC COMPANY; | ) | |
| And DOES 1-10 | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## COMPLAINT FOR DAMAGES

**NOW INTO COURT**, comes Plaintiff, Judy Gomilla (hereinafter "Plaintiff"), a person of the age of majority and a resident and citizen of the State of Louisiana, who with respect represents as follows:

1

## PARTIES

### I.

Plaintiff, Judy Gomilla, is a resident and citizen of Pearl River, St. Tammany Parish, State of Louisiana.

### II.

Plaintiff was administered gadolinium-based contrast agents (hereinafter "GBCAs") called MultiHance, Omniscan and other GCBAs.

### III.

MultiHance was designed, manufactured, marketed and sold by Bracco Diagnostics, Inc., Bracco Research USA Inc., BIPSO GmbH, Bracco Imaging S.P.A., Bracco Group, Bracco Imaging Group, Takeda GmbH, and Acist Medical Systems, Inc. d/b/a Acist Silicon Valley as set forth herein.

### IV.

Omniscan was designed, manufactured, marketed and sold by GE Healthcare, Inc. and General Electric Company as set forth herein.

### V.

Other GBCAs were designed, manufactured, marketed and sold by DOES 1-5 as set forth herein.

### VI.

As a result of the administration of the foregoing GBCAs into Plaintiff's body, Plaintiff suffers from the debilitating symptoms of Gadolinium Deposition Disease (hereinafter "GDD"), which is a harmful, painful and incurable disease. Plaintiff developed GDD as a result of being injected with GCBAs manufactured by Defendants as set forth herein.

*MANUFACTURING DEFENDANTS*

VII.

Defendant, Bracco Diagnostics, Inc. is a Delaware corporation with its principal place of business in New Jersey. Bracco Diagnostics, Inc. is engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing and/or introducing MultiHance into interstate commerce, either directly or indirectly through third parties or related entities. This Honorable Court has personal jurisdiction over said Defendant under the doctrine of specific jurisdiction, because said Defendant purposefully introduced its product into the stream of commerce in Louisiana where it was administered to and injured Plaintiff.

VIII.

Defendant Bracco Research USA Inc. is a Delaware corporation. Bracco Research USA Inc. is engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing and/or introducing MultiHance into interstate commerce, either directly or indirectly through third parties or related entities. This Honorable Court has personal jurisdiction over said Defendant under the doctrine of specific jurisdiction, because said Defendant purposefully introduced its product into the stream of commerce in Louisiana where it was administered to and injured Plaintiff.

IX.

Defendant BIPSO GmbH is a foreign company domiciled in Germany. BIPSO GmbH is engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing and/or introducing MultiHance into interstate commerce, either directly or indirectly through third parties or related entities. This Honorable Court has personal jurisdiction over said Defendant under the doctrine of specific jurisdiction, because said Defendant purposefully introduced its product into the stream of commerce in Louisiana where it was administered to and injured Plaintiff.

X.

Defendant, Bracco Imaging S.P.A. is a foreign company domiciled in Italy. Bracco Imaging S.P.A. is engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing and/or introducing MultiHance into interstate commerce, either directly or indirectly through third parties or related entities. This Honorable Court has personal jurisdiction over said Defendant under the doctrine of specific jurisdiction, because said Defendant purposefully introduced its product into the stream of commerce in Louisiana where it was administered to and injured Plaintiff.

XI.

Defendant, Bracco Group is a foreign company domiciled in Italy. Bracco Group is engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing and/or introducing MultiHance into interstate commerce, either directly or indirectly through third parties or related entities. This Honorable Court has personal jurisdiction over said Defendant under the doctrine of specific jurisdiction, because said Defendant purposefully introduced its product into the stream of commerce in Louisiana where it was administered to and injured Plaintiff.

XII.

Defendant, Bracco Imaging Group is a foreign company domiciled in Italy. Bracco Imaging Group is engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing and/or introducing MultiHance into interstate commerce, either directly or indirectly through third parties or related entities. This Honorable Court has personal jurisdiction over said Defendant under the doctrine of specific jurisdiction, because said Defendant purposefully introduced its product into the stream of commerce in Louisiana where it was administered to and injured Plaintiff.

XIII.

Defendant, Takeda GmbH is a foreign company domiciled in Germany. Takeda GmbH is engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing and/or introducing MultiHance into interstate

commerce, either directly or indirectly through third parties or related entities. This Honorable Court has personal jurisdiction over said Defendant under the doctrine of specific jurisdiction, because said Defendant purposefully introduced its product into the stream of commerce in Louisiana where it was administered to and injured Plaintiff.

XIV.

Defendant, Acist Medical Systems, Inc. d/b/a Acist Silicon Valley is a Delaware corporation with its principal place of business in Minnesota. Acist Medical Systems, Inc. d/b/a Acist Silicon Valley is engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing and/or introducing MultiHance into interstate commerce, either directly or indirectly through third parties or related entities. This Honorable Court has personal jurisdiction over said Defendant under the doctrine of specific jurisdiction, because said Defendant purposefully introduced its product into the stream of commerce in Louisiana where it was administered to and injured Plaintiff.

XV.

Defendant, GE Healthcare, Inc. is a Delaware corporation engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing and/or introducing Omniscan into interstate commerce, either directly or indirectly through third parties or related entities. This Honorable Court has personal jurisdiction over said Defendant, because Defendant placed its product into the stream of commerce in Louisiana where it was administered to and injured Plaintiff.

XVI.

Defendant, General Electric Company, is a New York corporation engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing and/or introducing Omniscan into interstate commerce, either directly or indirectly through third parties or related entities. This Honorable Court has personal jurisdiction over said Defendant, because Defendant placed its product into the stream of commerce in Louisiana where it was administered to and injured Plaintiff.

XVII.

Upon information and belief, DOES 1-5 were at all pertinent times engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing and/or introducing GCBAs into interstate commerce, either directly or indirectly through third parties or related entities.  This Honorable Court has personal jurisdiction over said Defendants, because Defendants placed their products into the stream of commerce in Louisiana where the products were administered to and injured Plaintiff.

XVIII.

Plaintiff alleges upon information and belief that Manufacturing Defendants including DOES 1-5 manufactured GBCAs that were injected into Plaintiff and/or manufactured MRI and/or MRA machines with which MRIs and/or MRAs were performed on Plaintiff using GBCAs.  Plaintiff alleges upon information and belief that each of these fictitiously named Defendants bear some legal responsibility for the events and damages as alleged herein.  The true names and capacities of Defendants designated as DOES 1-5 are unknown to Plaintiff at this time.

XIX.

Plaintiff alleges upon information and belief that DOES 1-5 are companies authorized to do and doing business in the State of Louisiana and were responsible for producing GBCAs including the GCBAs injected Plaintiff causing Plaintiff to sustain injuries and damages as alleged herein.

XX.

Plaintiff will request leave to amend this Complaint if necessary to include the actual identity of each fictitiously named Defendant as soon as this information has been ascertained.

XXI.

The Manufacturing Defendants, including DOES 1-5, are referred to herein collectively as the Manufacturing Defendants.

XXII.

At all relevant times, Manufacturing Defendants advertised, promoted, marketed, distributed and sold their GBCAs throughout the United States, including Louisiana.

## *DISTRIBUTOR DEFENDANTS*

XXIII.

Upon information and belief, Defendant McKesson Corporation (hereinafter "McKesson") distributes MultiHance and other GBCAs in Louisiana and elsewhere.  Plaintiff alleges that McKesson distributed MultiHance and other GBCAs that were injected into Plaintiff, causing her injuries and damages.

XXIV.

Defendant McKesson is a Delaware corporation duly authorized to conduct and conducting business within the State of Louisiana.

XXV.

Defendant McKesson Medical-Surgical, Inc. distributes MultiHance and other GCBAs in Louisiana and elsewhere.  Plaintiff alleges that McKesson Medical-Surgical, Inc. distributed MultiHance and other GBCAs that were injected into Plaintiff, causing her injuries and damages.

XXVI.

Defendant McKesson Medical-Surgical, Inc. is a Virginia corporation duly authorized to conduct and conducting business within the State of Louisiana.

XXVII.

Defendant, Merry X-Ray Chemical Corporation ("Merry X-Ray") distributes MultiHance and other GBCAs in Louisiana and elsewhere.  Plaintiff alleges that Merry X-Ray distributed MultiHance and other GBCAs that were injected into Plaintiff, causing her injuries and damages.

7

XVIII.

Defendant Merry X-Ray is a California corporation authorized to conduct and conducting business within the State of Louisiana.

XXIX.

The true names and capacities of Defendants designated as DOES 6-10 are unknown to Plaintiff at this time.  Plaintiff alleges upon information and belief that DOES 6-10 distributed GBCAs that were injected into Plaintiff.  Plaintiff alleges upon information and belief that these fictitiously named Defendants bear some legal responsibility for her alleged injuries and damages as set forth herein.

XXX.

Plaintiff alleges upon information and belief that DOES 6-10 were and are companies authorized to conduct and conducting business within the State of Louisiana at all relevant times.

XXXI.

Plaintiff will seek leave from this Honorable Court to amend this Complaint if necessary to identify each of the fictitiously named defendants once their identities have been ascertained.

XXXII.

McKesson Corporation, McKesson Medical-Surgical, Inc., Merry X-Ray Chemical Corporation and DOES 6-10 are collectively referred to as Distributor Defendants.

XXXIII.

The Manufacturing Defendants and Distributor Defendants are collectively referred to herein as Defendants.

## JURISDICTION AND VENUE

### XXXIV.

This Honorable Court has subject matter jurisdiction, because the amount in controversy exceeds $75,000.00 exclusive of interest and costs. Plaintiff suffers and will continue to suffer from the painful and debilitating symptoms of GDD for the remainder of her life. There is complete diversity of citizenship between Plaintiff and Defendants. Plaintiff is a resident and citizen of and is domiciled in the State of Louisiana. Defendants are both foreign entities conducting business within the State of Louisiana.

### XXXV.

This Honorable Court has jurisdiction over Defendants, each of which was at all relevant times licensed to conduct and/or conducting business in the State of Louisiana, including, but not limited to, the marketing, researching, testing, advertising, selling, and distributing of products including the aforementioned GBCAs to residents of the State of Louisiana.

### XXXVI.

Venue is proper in this Judicial District, because plaintiff is a resident and citizen of the State of Louisiana and domiciled within Pearl River, St. Tammany Parish, Louisiana, which is located within this Judicial District. Defendants marketed, advertised, and distributed GBCAs that harmed Plaintiff in this Judicial District. At all relevant times, Defendants conducted substantial business within the State of Louisiana and within this Judicial District; and, at all relevant times, Defendants developed, manufactured, promoted, marketed, tested, researched, distributed, warranted and sold their GBCAs in interstate commerce, including within this Judicial District.

## FACTS

### XXXVII.

Plaintiff had normal kidney function at the time Defendants' GCBAs were administered to Plaintiff after which Plaintiff developed the symptoms of GDD. Plaintiff was subjected to multiple MRIs during which Defendants' GBCAs were

injected into her body.  Plaintiff began experiencing the symptoms of GDD soon after being administered GBCAs.  Plaintiff's GDD symptoms include: skin patchiness, bone and joint pain and cognitive impairment.

XXXVIII.

GDD is the name of a disease process observed in patients with normal or near-normal renal function who develop persistent symptoms following the administration of GCBAs including those manufactured by Defendants and administered to Plaintiff.  No preexisting disease or subsequently developed alternate disease process is present that accounts for Plaintiff's GDD symptoms. GDD symptoms are consistent with the known toxic effects of retained gadolinium.  Typical clinical features of GDD include persistent headaches, bone and joint pain, and clouded mental ability.  Persons with GDD often experience clinically significant subcutaneous soft-tissue thickening.  Tendons and ligaments in the comparable distribution may also be painful and exhibit a thickened appearance.  Persons with GDD often experience excruciating pain, often in the distal distribution, or the arms and legs, torso and otherwise generalized in location.  The pain sensation has been described as sharp pins, needles, cutting and/or burning.  GDD is progressive in nature, and there is no known cure.

XXXIX.

GDD only occurs in patients injected with GCBAs as a contrast agent during an MRI or MRA.

XL.

Gadolinium is highly toxic.  It does not occur naturally in the human body. The only pathway for gadolinium to have entered the plaintiff's body was through injection during her MRI/MRA procedures.

XLI.

During the time that Defendants manufactured, distributed, sold and administered GBCAs, there have been numerous case reports, studies, assessments, papers, peer-reviewed literature, and other clinical data that have addressed GDD in connection with the administration of GCBAs.  In addition, there have been a

significant number of publicized complaints and comments from persons afflicted with the symptoms of GDD.  At all pertinent times, this information was available to Defendants, who were on notice of the harmful propensities of GCBAs to cause the alleged harm herein.

XLII.

At the time Plaintiff was injected with Defendants' GCBAs, Defendants knew or should have known that the use of GCBAs created an unreasonable risk of bodily harm in patients like Plaintiff.

XLIII.

Defendants failed to warn Plaintiff and her healthcare providers about the serious health risks associated with GCBAs, including the GCBAs manufactured by Defendants and administered to Plaintiff and failed to disclose the fact that there were safer alternatives.

XLIV.

As a direct and proximate result of of being injected with Defendants' GBCAs, Plaintiff developed GDD.

XLV.

Defendants have repeatedly and consistently failed to disclose to consumers and or their healthcare providers the causal relationship between GBCAs, harmful gadolinium retention and GDD.  Defendants knew or should have known of the risk of GDD posed by GBCAs to individuals like Plaintiff.

XLVI.

Had Plaintiff or her Healthcare providers been warned about the risks associated with Defendants' GBCAs, she would not have been administered Defendants' harmful GBCAs and would not be afflicted with GDD.

XLVII.

As a direct and proximate result of Plaintiff's being administered Defendants' GBCAs, Plaintiff suffered and continues to suffer severe physical pain

and suffering and mental anguish and emotional distress, and which she will continue to suffer due to the incurable nature of GDD.

## XLVIII.

As a direct and proximate result of being administered Defendants' GCBAs, Plaintiff has incurred and will continue to incur medical expenses and other economic damages, and which Plaintiff will continue to incur in the future.

## XLIX.

The nature of Plaintiff's injuries and damages and their relationship to GBCAs was not discovered, and through reasonable care and due diligence would not have been discovered, by Plaintiff until a time less than one year before the filing of this Complaint.  While, at one point, Plaintiff became aware that that she had retained gadolinium, she was not aware of the connection between her symptoms and gadolinium retention until a later date.

## L.

Plaintiff was tested for gadolinium retention on December 18, 2017, and on December 27, 2017, her test results reflected that she was positive for gadolinium retention.

## LI.

In 1984, prior to FDA approval, the inventors of GBCAs claimed that their products did not cross the blood-brain barrier and that the bonds between toxic gadolinium and its protective molecular coating did not break down within the body.  They further claimed that no toxic gadolinium residue remained in the body to cause illness.

## LII.

The two basic types of contrast agents that are differentiated by their chemical structure are linear and macrocyclic.  Linear agents do not fully envelope the gadolinium ion, while macrocyclic agents form a complete ring around the gadolinium ion that remains more stable as GCBAs pass through the body.  Linear agents include MultiHance, Omniscan and other GBCAs, which were

manufactured by Defendants.   Greater safety due to more stable macrocyclic contrast agents as compared to linear contrast agents is well established.

LIII.

By 1988, it became recognized that gadolinium was breaking free from the bonds in linear contrast agents due in part to the competition for its protective layer (the chelate) by other essential metals in the body such as zinc, copper and iron. Emerging science demonstrated that the bond between toxic gadolinium and its chelate or cage became very weak and separates readily in low pH conditions found in many compartments of the human body, including extracellular fluid spaces.

LIV.

Stability differences among gadolinium contrast agents have long been recognized in laboratory (in vitro) and deposition of toxic gadolinium in tissues has been described in animal models since at least 1984.   The first major study that showed deposition in humans appeared in 1998 regarding patients with renal failure and later in 2004 in patients with normal renal function.

LV.

Laboratory (in vitro) studies assessing the stability of each gadolinium-based contrast agent in human blood were performed and demonstrated that, over time, greater percentages of gadolinium were released from linear agents as compared to the macrocyclic agents, which showed superior stability.   The lack of stability seen within the linear agents was not considered to be a problem as long as the contrast agent was excreted out of the body according to the drug's claimed half-life, before the chelate could release the toxic gadolinium.   However, it was later noted that other conditions could cause prolonged retention of the contrast agents, thus allowing more toxic gadolinium to be released in the bodies of patients.   In addition, a delayed elimination phase of the GBCAs would later be discovered.

LVI.

Peer-reviewed articles in the deposition of gadolinium in animals with normal renal function, illustrating deleterious consequences, were published as early as 1984.

LVII.

Following FDA approval of GBCAs, the pre-clinical safety assessment and pharmacokinetic data were published describing its pharmacokinetics in rats, rabbits, and cynomolgus monkeys.  These studies demonstrated that while toxic gadolinium was no longer detectible in the blood 7 days after administration, quantifiable concentrations of gadolinium were persistent in both the renal cortex and areas around bond cartilage.

LVIII.

The first report of toxic gadolinium retention in humans may have been presented in September of 1989.  Scientists reported that intracerebral masses remained enhanced on MRI images obtained 8 days after injection of gadolinium. Subsequent chemical analysis revealed that a high concentration of gadolinium remained in the tissue.  After this report, there was no further mention of gadolinium retention in humans until 1998.

LIX.

Defendants knew that their linear gadolinium products were unstable and that the bonds of linear gadolinium come apart readily causing significant toxicity in humans.

LX.

Over the next 18 years, additional evidence was forthcoming, and additional research began to emerge regarding the release of toxic gadolinium from linear contrast agents like those manufactured, sold and distributed by Defendants, and the long-term retention of gadolinium in the bodies of animals and humans. Nephrologists and other scientists connected to the administration of linear-gadolinium based contrast agents to a rapidly progressive debilitating and often fatal condition called gadolinium-induced Nephrogenic Systemic Fibrosis (NSF),

prompting the FDA to issue a black box warning on all gadolinium-based contrast agents in 2006.  NSF is a debilitating disease in which patients' skin and vital organs fibrose, becoming wood-like.  There are over 500 NSF cases reported and estimated to be well over a thousand non-reported.

LXI.

Because obvious signs of clinical pathology associated with NSF were only seen in patients who had severely reduced renal function, it was widely and wrongly assumed by the public that people with normal renal function were not in danger from the use of GBCAs.  However, research continued to report evidence that toxic gadolinium was being stored in people with normal renal function.

LXII.

Although many patients with debilitating symptoms who had normal renal function that received injections with GBCAs had already been reporting adverse reactions for years to the FDA, manufacturers and poison control, no link between gadolinium and their symptoms was ever officially made public.  This is partially due to the fact that blood and urine testing for gadolinium only became available recently.  Additionally, most doctors were not aware of any disease associated with gadolinium other than NSF, which is said to only occur in patients with renal failure.  Gadolinium toxicity is an underreported and underdiagnosed condition. Over the past six years (since the link between gadolinium and NSF was acknowledged), patients with normal renal function have been forming advocacy groups and coming forward to create awareness for their condition.  Symptomatic patients often have documentation of high levels of gadolinium in their blood and urine several days, weeks, months and even years after their exposure to GBCAs. Many patients even had tissue biopsies of various parts of their body that showed no additional evidence of retained gadolinium years after their exposure.

LXIII.

Patients sent several strongly worded letters with scientifically-supported research to the FDA warning about the occurrence of gadolinium toxicity in those with normal renal function following injections of GCBAs.  Correspondence was confirmed as early as 2012.

15

LXIV.

In 2013, while examining non-contrast enhanced MRI images, Japanese researchers found evidence of retained gadolinium in the brains of patients with normal renal function that had previously received one or more injections of GBCAs up to several years prior.  They found that the brain had hypertensive signals in critical areas of the brain.

LXV.

The foregoing findings were confirmed by scientists at the Mayo Clinic in 2014 when autopsy studies were performed on 13 deceased individuals, all of whom had normal or near normal renal function and who had received six or more injections of GBCAs in the years prior.  Up to 56 mcg of gadolinium per gram of desecrated tissue were found within the brains of these patients.

LXVI.

As these new findings emerged, the entire radiology community was put on high alert, and several large universities conducting research to further address this concern.

LXVII.

In July of 2015, and in direct response to the Mayo Clinic's study's findings, the FDA issued a new public safety alert.  The FDA is evaluating the risk of brain deposits from repeated use of GBCAs with MRIs, and they have had the National Center for Toxicological Research Team working on determining the exact consequences of these new findings.

LXVIII.

In September 2017, the FDA's medical advisory committee voted 13 to 1 in favor of adding a warning on labels that gadolinium can be retained in some organs, including the brain, even in patients with healthy kidneys.

LXIX.

Defendants have known about the risks that GBCAs pose to persons with normal kidney function for years.  Pharmacokinetic studies in 1991 indicated that gadolinium retention was occurring in people with normal renal function.  In 2004, gadolinium was shown to be deposited in the resected femoral heads of people who had undergone gadolinium chelate enhanced MRI studies.  Since then, studies have continued to indicate that gadolinium remains within people's bodies long after the suggested half-life.

LXX.

Defendants were also involved in prior litigation involving these products and have made statements about these products denying that they cause the types of injuries alleged in this complaint.

LXXI.

Defendants are estopped from asserting a statute of limitations defense because all Defendants fraudulently concealed from Plaintiff the harmful nature of GBCAs.

## FIRST CAUSE OF ACTION

## STRICT LIABILITY – FAILURE TO WARN

LXXII.

Plaintiff incorporates by reference and realleges each paragraph set forth above.

LXXIII.

Defendants' GBCAs were defective due to inadequate warnings or instructions for use, both prior to marketing and post-marketing.  Defendants knew or should have known that their products created significant risks of serious bodily harm to consumers.  Defendants failed to adequately warn consumers and their health providers of such risks.

LXXIV.

Due to Defendants' failure to provide adequate warnings with their products, Plaintiff was injected with GBCAs that Defendants manufactured, designed, sold, supplied, marketed or otherwise introduced into the stream of commerce. Those GBCAs are the legal and proximate cause of Plaintiff's serious physical injuries, harm, damages and economic losses. Plaintiff will continue to suffer such harm, damages and economic loss in the future.

LXXV.

The foregoing acts, conduct and omissions of Defendants were wanton, willful, fraudulent and in flagrant disregard for the health, safety and welfare of Plaintiff and others using GBCAs, entitled Plaintiff to exemplary damages.

## SECOND CAUSE OF ACTION

## NEGLIGENCE

LXXVI.

Plaintiff incorporates by reference and reallages each paragraph set forth above.

LXXVII.

Defendants had a duty to exercise reasonable care in the design, formulation, testing, manufacture, labeling, marketing, sale and/or distribution of gadolinium-based contrast agents and the MRI and MRA machines designed to be used in conjunction with GBCAs. In particular, they had a duty to ensure that their products did not pose an unreasonable risk of bodily injury and adverse events.

LXXVIII.

Defendants failed to exercise reasonable care in the design, formulation, manufacture, sale, testing, marketing, or distribution of gadolinium-based contrast agents and the MRI and MRA machines designed to be used in conjunction with GBCAs in that they knew or should have known that the products could cause significant bodily harm or death and were not safe for use by certain types of consumers.

18

LXXIX.

Defendants failed to exercise ordinary care in the labeling of GBCAs and the labeling of MRI and MRA machines designed to be used in conjunction with GBCAs and failed to issue to consumers and their health care providers adequate warnings concerning the risks of serious bodily injury due to the use of GBCAs and the MRI and MRA machines designed to be used in conjunction with GBCAs.

LXXX.

Despite the fact that Defendants knew or should have known that the GBCAs and the MRI and MRA machines designed to be used in conjunction with GBCAs posed serious risk of bodily harm to consumers, Defendants unreasonably continued to manufacture and market GBCAs and the MRI and MRA machines designed to be used in conjunction with GBCAs and failed to exercise reasonable care with respect to post-sale warnings and instructions for safe use.

LXXXI.

At all relevant times, it was reasonably foreseeable to Defendants that consumers like Plaintiff would suffer injury as a result of their failure to exercise ordinary care as described above.

LXXXII.

As a direct and proximate result of Defendants' negligence, Plaintiff has suffered physical injuries, harm, damages and economic loss and will continue to suffer such harm, damages, and economic loss in the future.

## **THIRD CAUSE OF ACTION**

### **FRAUD**

LXXXIII.

Plaintiff incorporates by reference and realleges each paragraph set forth above.

LXXXIV.

Defendants knowingly and intentionally made materially false and misleading representations to Plaintiff's healthcare providers and to the public, to the effect that GBCAs, including those administered to Plaintiff, were safe and effective for use and that their labeling, marketing and promotional materials fully described all known risks of the products.

LXXXV.

Defendants' representations were in fact false. The GBCAs manufactured by Defendants are not safe for use, and Defendants' labeling, marketing, and promotional materials did not fully describe all known risks of the products.

LXXXVI.

Defendants had actual knowledge that their GBCAs created an unreasonable risk of serious bodily injury to consumers.

LXXXVII.

Defendants knowingly and intentionally omitted known information from their labeling, marketing and promotional materials and instead labeled, promoted and marketed their products as safe for the benefit of sales.

LXXXVIII.

When Defendants made representations that GBCAs were safe for use, they knowingly and intentionally concealed and withheld from Plaintiff, her physicians, and the public, the fact that their GBCAs are not safe for use.

LXXXIX.

Defendants had a duty to disclose that GBCAs are not safe for use. Defendants had superior knowledge of these facts that were material to Plaintiff and her healthcare providers' decisions to use the GBCAs that were administered to Plaintiff.

XC.

Plaintiff and her healthcare providers reasonably and justifiably relied on Defendants' representations that their GBCAs were safe for human use and that Defendants' labeling, marketing and promotional materials fully described all known risks associated with the products.

XCI.

Plaintiff did not know, and could not have learned of the facts that Defendants omitted and suppressed.  The facts suppressed and concealed by Defendants are material.  Had Plaintiff and her healthcare providers known that GBCAs were not safe for use, Plaintiff would not have been injected with Defendants' GBCAs.

XCII.

As a direct and proximate result of the Defendants' misrepresentations and concealment, Plaintiff was administered GBCAs and has suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

XCIII.

The foregoing acts, conduct and omissions of Defendants were willful, malicious, wanton, fraudulent, in conscious disregard for the health, safety and rights or Plaintiff and other users of Defendants' GBCAs, and for the primary purpose of increasing Defendants' profits.  As such, Plaintiff is entitled to exemplary damages.

## FOURTH CAUSE OF ACTION

## FRAUD: CONCEALMENT, SUPPRESSION OR

## OMISSION OF MATERIAL FACTS

XCIV.

Plaintiff incorporates by reference and realleges each paragraph set forth above.

XCV.

Defendants omitted, suppressed or concealed material facts concerning the dangers and risks associated with the use of their GBCAs and the fact that safer alternatives were available.  Further, the Defendants purposefully downplayed and understated the serious nature of the risks associated with use of their GBCAs in order to increase and sustain sales.

XCVI.

As a direct and proximate result of Defendants' concealment of material facts, Plaintiff was administered their GBCAs and has suffered physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

XCVII.

The foregoing acts, conduct and omissions of Defendants were willful, malicious, wanton, fraudulent, in conscious disregard for the health, safety and rights of Plaintiff and other users of Defendants' GBCAs, and for the primary purpose of increasing Defendants' profits.  As such, Plaintiff is entitled to exemplary damages.

**FIFTH CAUSE OF ACTION**

**NEGLIGENT MISREPRESENTATION**

XCVIII.

Plaintiff incorporates by reference and realleges each paragraph set forth above.

XCIX.

Defendants supplied the public and Plaintiff's healthcare providers with materially false and incomplete information with respect to the safety of of their GCBAs.

C.

The false information supplied by Defendants was that GBCAs are safe.

CI.

In supplying this false information, Defendants failed to exercise reasonable care.

CII.

The false information communicated by Defendants to Plaintiff and her healthcare providers was material and Plaintiff justifiably relied in good faith on the information to her detriment.

CIII.

As a direct and proximate result of Defendants' misrepresentations, Plaintiff was administered GBCAs and has suffered physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

i.   Compensatory damages to Plaintiff including but not limited to pain and suffering for severe and permanent personal injuries, permanent impairment, mental pain and suffering, loss of enjoyment of life, and economic damages, together with interest and costs as provided by law;

ii.  Past and future medical expenses;

iii. Punitive or enhanced compensatory damages;

iv.  Reasonable attorneys' fees as provided by law;

v.   Costs of these proceedings, including past and future costs of the suit;

vi.  All ascertainable economic damages;

vii. Prejudgment interest on all damages as allowed by law; and

viii.Such other and further relief as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

MORRIS BART, LLC

/s/ *John C. Enochs*_____
Betsy Barnes (La. Bar No. 19473)
Richard Root (La Bar No. 19988)
John Enochs (La. Bar No. 22774)
Lauren E. Godshall (La. Bar No. 31465)
601 Poydras Street, 24th Floor
New Orleans, Louisiana 70130
Phone: (504) 599-3373
Facsimile: (504) 599-3392
bbarnes@morrisbart.com
rroot@morrisbart.com
jenochs@morrisbart.com
lgodshall@morrisbart.com